IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| JOHN FURGESS, JR., | ) Civil Action No. 3:05-1206-CMC-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) **REPORT AND RECOMMENDATION** |
| Defendant. | ) |
| | ) |

Plaintiff, John Furgess, Jr., ("Furgess"), filed this action on April 25, 2005. He alleges a claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") .[1] Defendant, United Parcel Service, Inc. ("UPS"), filed a motion for summary judgment on May 15, 2006. Furgess filed a memorandum in opposition to summary judgment on June 5, 2006. UPS filed a reply on June 15, 2006.

SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7.

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS

1. UPS is in the business of small-package delivery throughout the world. In the United States, UPS is divided into ten geographic "regions," and each of these regions is divided into a number of "districts." The facts underlying this action took place in the South Carolina District, which is part of UPS's Atlantic Region. Decl. of Hazel Bennett ("Bennett"), ¶ 2.

2. Each UPS district includes a number of "hubs" and "package centers." At hubs, packages are sorted for transportation to other hubs and to package centers. A package center is responsible for the pickup and delivery of packages from customers in an assigned area. There are two hubs located in Columbia, a hub that handles packages designated for transport to another hub by airplane ("air" hub), and a hub that handles packages designated for transport to another hub by truck ("ground" hub). Bennett Decl. ¶ 3. The alleged incidents took place at the ground hub in Columbia.

3. Furgess, an African-American male, began working for UPS in 1985 as a part-time loader/unloader. He began working as a package car driver in the Columbia ground hub in 1994. Plaintiff's Dep. 46-47.

4. Package car drivers operate brown delivery trucks, which UPS refers to as package cars, and are responsible for the delivery and pickup of packages from UPS customers on pre-assigned delivery routes. Bennett Decl. ¶ 4.

5. In September 2000, Furgess was approached by supervisor Lloyd Loper, who commented that he did not know how Furgess was able to finish his route so quickly. Furgess told Loper that some of his customers had given him permission to sign on their behalf. Loper informed Furgess that he should not sign for the customers and he should instead let the customer sign for their packages. Plaintiff's Dep. 201-203.

6. Furgess continued to sign for some of his customers because he felt that he "had to" in order to complete his route because UPS "kept loading [his] truck down." He asked Lloyd for a time study because he thought he did not have enough time to complete his route. No time study was scheduled. Plaintiff's Dep. 203-205.

7. Chuck Paxton ("Paxton") is a Security Supervisor, also known as an Investigator, for UPS. Paxton states that a crucial part of UPS's business is properly recording customer signatures and other information relevant to the delivery process. UPS has written procedures for drivers to follow and drivers receive training on the procedures at the beginning of their employment and annually. Paxton Decl. ¶ 3 and Ex. 1 (Delivery and Pickup Methods).

8. In September 2000, UPS began an internal investigation of several drivers, including Furgess, who were suspected of falsifying delivery records. Paxton states that the investigation revealed Furgess was falsely reporting the number of packages over 70 pounds on his route (which may have inflated Furgess's compensation) and he was also forging customer signatures. Paxton Decl. ¶¶ 4-6 and 8.[2]

---

[2]Paxton states that based on UPS's time studies, package car drivers are allocated a specific amount of time to complete their routes. If a driver finishes the assigned route early, he or she is eligible for a performance bonus. Heavier packages require additional time to deliver, such that package car drivers who report packages of over 70 pounds are given an extra time allowance on
(continued...)

4

9.  Although Furgess conceded that he signed on behalf of some customers on his route, he told Paxton that he only signed on behalf of customers who had given him permission to do so. Furgess collected statements from a number of customers on Furgess's route who reported that they had not given Furgess permission to sign on their behalf, memoranda from customers who reported they were missing packages for which Furgess had signed,[3] and letters claiming that Furgess had improperly used customer's office equipment (computers to check emails and phones for personal calls) during his deliveries. Paxton Decl. ¶ 7 and Ex. 2.

10. On September 26, 2000, Furgess met with Paxton and other UPS management personnel regarding the falsification of delivery records. Furgess signed a statement admitting that he had signed on behalf of customers despite previous counseling by UPS supervisors not to do so. See Plaintiff's Dep. 213, 219, Ex. D-14; Paxton Decl. ¶ 6 and Ex. 2.

11. At the end of the meeting, Furgess was informed that he was discharged for falsification of delivery records. Plaintiff's Dep. 209, 219, D-15. The separation form, which Furgess refused to sign, indicates he was terminated for dishonesty and was ineligible for rehire. Approximately one week later, Furgess received a letter formalizing his discharge and reiterating the reasons for his discharge. See Plaintiff's Dep. 269-270, Ex. D-26; Paxton Decl. Ex. 2.

---

[2](...continued)
their routes. Paxton's audit of Furgess's delivery records revealed that on each of the five days audited, Furgess reported three times as many heavy packages as he actually handled. Paxton stated that based on the extra time allowance and early-finish bonus, the cost to UPS of these misrepresentations would total approximately $1844.15 annually. Paxton Decl., Para. 8; Ex. 2.

[3]One missing package reportedly contained a computer worth $2,500.00. Paxton Decl., Ex. 2.

12. Furgess acknowledges that he was advised he was ineligible for rehire at the time of his discharge in 2000. Plaintiff's Dep. 179-180.

13. The terms and conditions of employment for package car drivers are governed by a Collective Bargaining Agreement ("CBA") between UPS and the International Brotherhood of Teamsters (the "Union"). Furgess was a member of the Union. Disputes between UPS and the Union concerning discipline of Union members are resolved by utilizing the grievance procedures outlined in the CBA. After a grievance is filed, the first step is a local-level hearing where representatives of UPS meet with the employee and Union representatives to discuss the merits of the grievance and exchange documents. If a grievance is not resolved at the local-level hearing, then the grievance proceeds to a hearing (also known as a panel hearing) before the Atlantic Area Parcel Grievance Committee ("AAPGC"). Bennett Decl. ¶¶ 8-9; Plaintiff's Dep. 54.

14. On September 27, 2000, the Union filed a grievance on Furgess's behalf alleging that his termination was unjust. A local-level hearing was held in late September, but the parties were unable to reach agreement concerning the grievance. See Plaintiff's Dep. 254, 272, D-24, and D-27.

15. The Union declined to grieve Furgess's termination further by requesting a panel hearing before the AAPGC. Union Business Agent Charles Porterfield, an African-American male, wrote a letter informing Furgess that the position of the Union was that they could not be successful at the panel meeting based on Furgess's admission at the local level hearing that he inflated the reported number of 70-pound packages as well as inflating the number of pickup packages which resulted in increased wages. Another articulated reason was that

       Furgess claimed he never got his dinner hour, but UPS provided documents from August 2 to September 21, 2000 (driver route detail analysis) indicating Furgess routinely took his dinner hour. Plaintiff's Opposition Memorandum, Attachment II; Plaintiff's Dep. Ex. D-27; Porterfield Dep. 50.

16. Shortly after the grievance was dismissed, Furgess's counsel wrote a letter to Porterfield, requesting the Union reconsider its decision not to pursue Furgess's grievance before the AAPGC. Porterfield stated he did not receive the letter, presumably because he was no longer the Business Agent at the time the letter was sent. Porterfield Dep. 48-50, Ex. D-1. No further action was taken by the Union or Furgess concerning the termination.

17. On March 12, 2004, Furgess completed an on-line "job inquiry" concerning part-time package handler positions. Plaintiff's Dep. Ex. D-2.

18. Furgess was called into UPS to participate in a mass interview and tour of the plant on March 22, 2004. Plaintiff's Dep. 379-380.

19. At the time, the application process for preload positions at UPS's ground hub in Columbia was administered by Alvin Jones ("Jones"), an African-American Human Resources Supervisor who was responsible for hiring employees for the preload shift at the hub. Jones Decl. ¶¶ 3, 5, and 12.

20. At the time, UPS used a multi-step application process for new hires. An individual seeking employment with UPS had to complete all of the steps to be considered for a position with the Company. See Bennett Decl. ¶ 10; Jones Decl. ¶ 3.

21. An individual first contacted UPS and was scheduled for a group informational meeting and tour of the relevant UPS facility. The individual next attended a group informational

meeting and provided contact information and other information relevant to the hiring process. Next, a UPS supervisor took the group on a tour of the facility and individuals completed a UPS questionnaire that solicited further information about the individual's interest in employment with UPS and outlined the terms and conditions of the position in which the individual expressed an interest. After completing the tour and paperwork, the individual was told to return for a one-on-one interview with a UPS supervisor on a later date, which UPS referred to as an "Initial Interview." At the Initial Interview, the individual completed a written employment application. Bennett and Jones state that an individual was not considered an applicant until he or she has completed the Initial Interview and submitted an employment application. The written employment application asked whether an individual was previously employed by UPS.[4] If the applicant successfully completed the Initial Interview, he or she was scheduled for a Second Interview. Following completion of the Second Interview, a final employment decision was made. Bennett Decl. ¶ 10; Jones Decl. ¶ 3.

22. Furgess attended the group informational meeting, completed the Information Sheet, went on the facility tour, completed the UPS Questionnaire, and completed the UPS form outlining the terms and conditions of employment for the part-time loader/unloader position. Plaintiff's Dep. 88-103, 150-154, 156-157, Exs. D-3, D-4, D-5, and D-6; Jones Decl. ¶ 6, Exs. 1-4 .

---

[4]If an applicant indicated previous employment with UPS, the hiring official checked the computer system to determine whether the applicant was eligible for rehire. Applicants who were classified as ineligible for rehire were denied employment with UPS, unless the hiring official determined that the ineligible designation was made erroneously. Bennett Decl., ¶ 6 and Ex. 1.

23. Jones states he advised the group that those who were still interested in applying should report to his office on the following morning, March 23, 2004, for the Initial Interview. The next day, several of the individuals who attended the meeting and tour with Furgess appeared for the March 23 Initial Interview, but Furgess did not. Jones designated Furgess as a "no show" in his records and in an e-mail to another supervisor. Jones Decl. ¶¶ 7-8, and Exs. 5-6.

24. Furgess disputes that Jones told him about the interview on March 23 and instead claims he was told to call UPS and schedule a one-on-one interview. He called UPS several times in an attempt to schedule a one-on-one interview. Furgess was later informed that he would not be considered for employment because he did not show up for an interview on March 23, 2004. See Plaintiff's Dep. 119-122, 376-377.

25. Furgess filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 2004. In the Charge, Furgess alleged that UPS failed to rehire him on the basis fo his race in violation of Title VII. The EEOC issued a Right-to-Sue Notice on January 24, 2005. Plaintiff's Dep. 174-175, 191, Ex. D-8, and Ex. D-13.

## DISCUSSION

Furgess claims that UPS failed to rehire him based on his race. UPS contends that it is entitled to summary judgment because Furgess cannot establish a prima facie case of discrimination based on a failure to rehire and it has articulated legitimate, non-discriminatory reasons for not rehiring Furgess which Furgess fails to show are pretextual. In its reply, UPS contends that this Court should not consider Furgess's response because it was untimely filed. Despite the

untimeliness of the response,[5] the undersigned has considered it in preparing this Report and Recommendation.

A plaintiff may proceed under ordinary principles of proof using direct or indirect evidence, or, in the absence of direct proof[6] of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973) to establish a prima facie case of discriminatory failure to hire or rehire by offering proof that:

(1)    he is a member of the protected group;

(2)    he applied for the position in question;

(3)    he was qualified for the position; and

(4)    he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.

See Brown v. McLean, 159 F.3d 898, 902 (4th Cir. 1998); Alvarado v. Board of Trustees of Montgomery Community College, 928 F.2d 118, 121 (4th Cir.1991).

A.    Prima Facie Case

The parties do not dispute that Furgess meets the first prong of his prima facie case, that he is a member of the protected group, but they dispute whether he meets the remaining three

---

[5] UPS filed its motion for summary judgment on May 15, 2006. On May 16, 2006, UPS filed a corrected filing to reflect correct attorney signatures. The docket, however, reflects that the corrected filing did not affect Furgess's original response due date of June 2, 2006 (fifteen plus three days). See Fed. R. Civ. P. 6; Local Rule 7.06, DSC; Electronic Case Filing Policies and Procedures, DSC at 6.3; and Docket Sheet. Furgess did not file his opposition memorandum until June 5, 2006, and did not request an extension of time to file the response.

[6] No direct proof has been offered in this action.

prongs of his prima facie case. Furgess fails to establish his prima facie case, as he fails to meet the second, third, and fourth prongs of his prima facie case, as discussed below.

        (1)      Applied for the Job

In his memorandum in opposition to summary judgment, Furgess appears to contend that he applied for the job because he completed an on-line application for the position. Furgess, however, fails to show that the on-line "inquiry" constituted a job application. Bennett and Jones state that in March 2004 it was not possible to apply for UPS employment on-line in South Carolina. Bennett Decl. ¶ 11; Jones Decl. ¶ 4. As noted above, the on-line form completed by Furgess only states that it is a job inquiry and Furgess has submitted nothing else to show that this was a job application form. Further, Furgess appears to concede that he did not complete the application process, as he discusses his need to schedule a one-on-one interview and his failure to obtain one. See Plaintiff's Opp. Mem. at 5. As discussed above, both Bennett and Jones described a four-step application process for the part-time loader position. Although Furgess attended the group meeting and went on a tour of the UPS facility, he did not complete an Initial Interview with the relevant UPS supervisor or submit the written application for employment provided at the interview.

Furgess argues that it is UPS's fault that he did not have a one-on-one interview because Jones did not tell him to report for one the next day and his phone calls requesting a one-on-one interview were not returned. He fails to show, however, that any miscommunication or the alleged failure of UPS to return his several phone calls excused his failure to satisfy the requirement that he apply for the job in question. See, e.g., Parker v. Airborne Express, No. 92C0678, 1992 WL 372998, at *5 (N.D. Ill. Dec. 11, 1992)(finding that while the plaintiff clearly expressed her interest

in a sales position, she never finished the application process and although she attempted to continue the process by leaving three messages with the defendant's hiring representatives, she failed to take any action to further pursue her application when those calls were not return and thus failed to properly apply for the position).

Furgess did attend a group informational meeting and completed a tour of the Columbia hub on March 22, 2004. Plaintiff's Dep. 88-103; Jones Decl. ¶¶ 6-8. Although Furgess claims that he was not told to appear for a March 23, 2004 interview with HR supervisor Alvin Jones, it is undisputed that Furgess did not do so while others on the tour did so. If, as alleged by Furgess, Jones misstated that the applicants needed to call and schedule an Initial Interview, this would have affected all applicants, not just Furgess. Further, Furgess fails to show any discriminatory animus on the part of Jones, an African-American male who knew that Furgess had previously been employed as a package car driver but did not know the reasons why Furgess left UPS (Jones Decl. ¶ 8).

        (2)    <u>Qualified for the Position</u>

Furgess fails to show that he was qualified for the position because he was ineligible for rehire as he was terminated for dishonesty. UPS contends that Furgess was not qualified for any position at UPS because the company classifies as ineligible for rehire any employee who is discharged for violations of UPS policies involving dishonesty or theft. As discussed above, UPS provided that Furgess was discharged from the company in September 2000 after an investigation revealed he was forging customer signatures and falsifying internal delivery records to inflate his compensation. UPS views such conduct as dishonest and constituting a theft of company resources and was classified as ineligible for rehire pursuant to it policy. <u>See</u> Plaintiff's

Dep., Ex. D-15. Furgess also admits that he was informed of this ineligibility at the time of his discharge. Plaintiff's Dep., Ex. D-8 at 1; Plaintiff's Dep. 179-180.

Furgess argues that he was qualified because UPS had changed its policy such that the company would rehire employees terminated for dishonesty. In support of his argument, he claims that Eric Powell ("Powell"), a Caucasian package car driver, was rehired after Furgess was terminated for dishonesty. As is discussed further below, however, there is no indication that Powell was rehired, but rather that his termination was changed to a suspension after the Union grieved UPS's actions. Furgess has pointed to no UPS policy indicating that its rehire policy had changed from that articulated by Bennett and contained in UPS's written policy. See Bennett Decl. ¶ 7 and Ex. 1.

        (3)    Rejected for the position under circumstances giving rise to an inference of unlawful discrimination.

Furgess also fails to show that he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. Furgess claims that the circumstances of his rejection give rise to an inference of discrimination because Powell was rehired despite having been discharged for conduct more egregious than his own conduct. Powell testified that he was terminated for forging a customer's signature. The customer claimed that the package allegedly delivered by Powell was never received by the customer. The Union grieved Powell's termination. Powell's termination was changed to a suspension and Powell was required to reimburse UPS $500.00 for the missing package.

UPS contends that Furgess's reliance on Powell as a comparator is misplaced because Powell was not similarly situated to Furgess. In making a comparison of a plaintiff's treatment to that of

employees outside the protected group, a plaintiff must show that the comparables are similarly situated in all relevant respects. See Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992); see also Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988)(plaintiff must prove that he and non-protected employee were similarly situated in all respects and the other employee's acts were of comparable seriousness to his own); see also Heyward v. Monroe, 166 F.3d 332, 1998 WL 841494 (4th Cir. Dec. 7, 1998)(unpublished)(employees similarly situated only if they "dealt with the same supervisor, [were] subject to the same standards and...engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (citations omitted)), cert. denied, 527 U.S. 1036 (1999); Smith v. Stratus Computer, Inc., 40 F.3d 11 (1st Cir. 1994)(in disparate treatment cases, employees must be similar in "all relevant aspects" including performance, qualifications, and conduct)(citation omitted), cert. denied, 514 U.S. 1108 (1995); see also Bogren v. Minnesota, 236 F.3d 399, 405 (8th Cir. 2000)(finding that probationary and non-probationary employees are not similarly situated), cert. denied, 534 U.S. 816 (2001).

Powell was not similarly situated to Furgess. He was never separated from employment as his "termination" was downgraded to a "suspension." Furgess was reinstated by the Union process,[7] not by being rehired into another job. See Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 770-71 (7th Cir. 1994)(retaliation case holding that where alleged comparators were reinstated from discharge as a result of grievance process, their more favorable treatment was not evidence of pretext); Lawrence v. Jewel Food Stores, Inc., No. 04C2979, 2006 WL 1005068, *14 (N.D.Ill. April 14,

---

[7]Although Furgess appears to complain that Porterfield did not respond to a letter he wrote him over four months after his termination, he has not named the Union as a defendant in this action.

14

2006)(holding that evidence that two non-African-American employees received lesser discipline than the plaintiff was not probative of discrimination where the lesser discipline was the result of the grievance process in which the employer was required to rehire the employees following arbitration on their behalf by their union).  Powell, unlike Furgess, was not attempting to apply for a part-time loader/unloader job.  Additionally, Furgess and Powell worked for different supervisors and the disciplinary decisions were made by different persons more than three years apart.  Although Furgess claims that Powell's conduct was more egregious than his,[8] Paxton states that he found Plaintiff not only to be forging signatures on multiple occasions, but also falsely reporting packages over 70 pounds which resulted in an inflation of Furgess's compensation.

There is no indication that someone outside the protected group was hired for the position Furgess sought.  Further, the decision maker here, Jones, was a member of Furgess's protected race group.  See Love v. Alamance County Bd. of Educ., 757 F.2d 1504, 1509 (4th Cir. 1985)(numerous female and black decision makers provided safeguard against discriminatory practices); DeWitt v. Mecklenburg County, 73 F. Supp. 2d 589, 598 (W.D.N.C. 1999)(employee's allegations were particularly unpersuasive where a number of the challenged employment decisions were made or implemented by a member of plaintiff's own protected class); Desesme v. Montgomery County Gov't, 63 F. Supp. 2d, 678, 683 (D. Md. 1999)(fact that decision makers were of the same protected

---

[8] In his EEOC Charge, Furgess alleged that "several former employees who were not eligible for re-hire have been hired, including a white male who committed a criminal act against [UPS]." Plaintiff's Dep., Ex. D-8.  In his Complaint, Plaintiff alleges that he "knows and has reason to believe that several Caucasian employees, who were terminated for more heinous offenses, were subsequently [] rehired after being told that they were ineligible for rehire." Complaint at ¶ III.  In his deposition, Furgess only identified one alleged comparator - Powell.  Further, he admitted that he had only a vague, second-hand account of Powell's alleged misconduct and had "no idea" who at UPS was involved in Powell's discharge or whether the Union filed a grievance on Powell's behalf.  See Plaintiff's Dep. 163-172.

y

class suggests no discriminatory motivation on the part of employer), aff'd, 208 F.3d 208 (4th Cir. 2000).

Furgess also claims that he meets the fourth prong because an African American package car driver, Asia Ferguson ("Ferguson"), was terminated for forging a customer's signature on a delivery the customer claims he did not receive, the Union grieved the termination, and the termination was converted to a suspension.  It is unclear how this shows that Furgess was rejected for the position of part-time loader/unloader under circumstances giving rise to an inference of unlawful discrimination as this action did not involve Furgess.  Further, there is no indication that Powell received treatment that was any more favorable than what Ferguson received.

To the extent that Furgess is attempting to assert claims concerning his termination, his claims fail.  No such claims were included in his complaint.  Further, he fails to show that he exhausted his administrative remedies as to any such claim.[9]

  B.  <u>Legitimate, Non-Discriminatory Reasons/Pretext</u>

Even if Furgess could establish his prima facie case, UPS has articulated legitimate, non-discriminatory reasons for not rehiring Furgess, that Furgess did not complete the required application process and that due to the nature of the conduct for which he was discharged, Furgess was ineligible for rehire by UPS.  Furgess fails to show pretext.  He alleges that Defendants'

---

[9]To pursue a claim, a plaintiff must have filed his complaint with the EEOC within 180 days of the incident, or within 300 days of the incident if state or local proceedings are initiated (as is the case here).  42 U.S.C. § 2000e-5(e)(1).  Before a federal court may assume jurisdiction over a claim under Title VII, "a claimant must exhaust the administrative procedures enumerated in 42 U.S.C. § 2000e-5(b), which include an investigation of the complaint and a determination by the EEOC as to whether 'reasonable' cause exists to believe that the charge of discrimination is true." Davis v. North Carolina Dep't of Correction, 48 F.3d 134, 137 (4th Cir. 1995).  Generally speaking, this court does not have subject matter jurisdiction under Title VII of claims omitted from the EEOC administrative charge.  Dennis v. County of Fairfax, 55 F.3d 151, 156-57 (4th Cir. 1995).

16

proffered reason for not considering him for further employment is pretextual because "Defendant conveniently failed to schedule Plaintiff for a one on one interview." Plaintiff's Opposition Memorandum, at 6. Furgess also appears to allege that the articulated reasons are pretextual because UPS created a new policy as to rehires when it "rehired" Powell. As has been discussed above, Jones states that he told candidates about the one-on-one interviews after the tour and many of the candidates showed up the next day for interviews. Even if he did not do that, Furgess fails to show that a failure of UPS to return several of his phone calls requesting an interview is pretextual. Powell testified that his termination was converted to a suspension. Further, as discussed above, Powell was not similarly situated to Furgess.

## CONCLUSION

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 33) be granted.

Respectfully submitted,

s/Joseph R. McCrorey
United States Magistrate Judge

September 22, 2006
Columbia, South Carolina